Today on oral argument, we will hear the first case and then take a brief recess and hear the final three. And we begin with, in the matter of interest to Energy Incorporated, Phillips v. Urquhart. Mr. Alibi, and I'm sure I mispronounced that, and I invite you to correct me. It is Alibi, Your Honor. May it please the Court. In just energy, this Court held that the State Courts of Texas should determine whether Urquhart and the PUCT complied with Texas's pervasive regulatory scheme regarding electricity. Abstention was thus required. Here, the trustee, in the same bankruptcy court, challenges the same actions of the PUCT and Urquhart, the same filed rate, and the same PUCT orders. Abstention is also required here. Moreover, the filed rate doctrine, the necessity of the PUCT as an indispensable party, and Urquhart's sovereign immunity, as recently confirmed by the Supreme Court of Texas, all require a dismissal of the trustee's claims. On any one of these grounds, the Court can abstain or dismiss. Reading the two hearings below in front of Judge Jones, your argument for abstention was pretty faint. Would you agree? The oral argument was correct, because we had argued multiple cases before Judge Jones regarding this issue. We had fully briefed it, and Judge Jones had made it very clear that he did not believe that Urquhart had sovereign immunity, that abstention was warranted, or that the PUCT was a necessary party. I thought maybe it was faint because it is awkward for me to think that you could voluntarily say, hey, write me a check for $300 million, and then once it looks like it's going to be difficult, you say, well, actually, our request, our proof of claim, means that even though we submitted it to you, we actually can't consider it here. It's got to go back to state court. You see, it's sort of a waiver forfeiture problem. You came in voluntarily asking for the court to write a check on your claim, and now you're saying to us that that Urquhart filed a proof of claim, and then the adversary complaint was filed. The adversary complaint raises issues regarding whether Urquhart complied with PUCT directives, complied with state law, whether the orders are vague or enforceable, whether they're directed. So the adversary complaint that raises these issues— You didn't anticipate any—when you filed that proof of claim, you had no notion that it would actually implicate the rates and the excessiveness of the unreasonableness, wouldn't even touch the filed rate doctrine? Do you see my question? And let me make it—let me phrase it as a legal one. You probably saw in their brief, they cite the Ninth Circuit lynch decision. I didn't see you responding to that. Would you agree that if we were to accept abstention here as to the pricing claims, we would have to conflict with that Ninth Circuit decision? I'm not sure that it conflicts, because I don't believe that here, by virtue of filing a proof of claim, and then the trustee subsequently filing an adversary complaint that raises issues that touch upon a regulatory scheme that is as pervasive as Texas's, and it's one of its kind, raises the same type of issue. And so, given what this Court said in Just Energy, and what the courts have done thereafter—for example, in Just Energy, after this Court issued its ruling and mandate, the bankruptcy court abstained, and the Just Energy parties went to state court and filed proceedings. Gritty was another bankruptcy case that was filed. We cite that in a footnote in our brief, where the court, after this Court's decision in Just Energy, said that Burford abstention applied, and there was a proof of claim filed in that case. So just as a rule of law, you're saying whether the party that later says it was reversible error for not abstaining, whether that party initiated the proceeding, sought resolution by a federal court, abstention still can allow them to say, well, once you pursued it, that was legal error, reversible error. That is your position or not? Your Honor's taking it to a broader point. I was looking at the bankruptcy context with a proof of claim and an adversary complaint, but I believe that the law generally is that abstention can be ordered sua sponte, according to the Supreme Court, under Bilotti. And so, a court can always determine that the issues that have now been raised by one or both of the parties raise issues that fall into this scheme of state law that is unsettled or highly regulated. Abstention basically protects comedy in the state courts. It really doesn't have anything to do with party forfeiture waiver. Is that, is that pretty much? Correct. And we've not, and no party's been able to find a case that said just the filing of a proof of claim in and of itself somehow allows a bankruptcy court to go forward, when a federal district court wouldn't have gone forward. In Burford, they said that the court should have abstained, and the Supreme Court said the dispute should go to the Texas Railroad Commission in the first instance. So what about the takings claim, though? Abstention doesn't so plainly apply to, to the takings claim, does it? I believe it does. I think that the Burford example is a good example of where there was abstention involving a due process claim. Strada, this Court's decision, considered whether abstention should apply to a takings claim. It didn't apply because it wasn't a sovereign, but Strada did consider, this Court considered in Strada whether there should be an abstention under a takings claim. The takings claim raises the same type of regulatory issues that all the pricing claims raise. And so the idea of what happens when an entity can't pay for electricity, and that Texas consumers are going to be without electricity or power, and what remedies ERCOT has allowed under this regulatory scheme that it sets forth by the PUCT rules and regulations, is all part of that scheme of state law that abstention should apply to. In addition to the fact that abstention could apply to that claim, we believe that the claim has three fundamental defects. Before you get to it, because I'm interested in that question, too, before you get to its You said you absolutely have that authority. That's separate from the pricing claims. Do you recall that or not? Correct. It was a different issue than the pricing claims. Okay, but you went so far as to say you have authority to do that. That's even more categorical against you have to abstain. Correct. But that was the Harmonize that with your answer to Judge Smith. You're saying even the takings claims have to be, the abstention has to occur, despite what you told the bankruptcy court. At the time that we were talking to the bankruptcy court, this court had not issued its decision in Just Energy. The stay had come down. The Just Energy stay had come down, correct? No. At the end of the second hearing? I thought all parties were No, it had not yet. In the gritty case, the Just Energy decision had come forth, but not in this case. Related, and then I'll let you get to the three defects. If you were to prevail and we were to order abstention as to them, two questions. Does that, still we have to deal with the dismissal, correct, of those counts? And number two, doesn't abstention contemplate that there is a pending state case involving takings? Not necessarily, because in Burford, the point of the abstention was to go to the Railroad Commission first. So, wouldn't it be a stay of the federal takings claim? Yes. It would be a stay of it. It wouldn't be an abstention. Or is that a distinction? Would that be a difference? That's correct. The concept would be abstaining from these claims or staying the case itself while state courts or state agencies address those issues. Do you have authority that Burford abstention applies claim by claim instead of by the action as a whole, or are you arguing that it applies to the entire action? I don't believe that this court needs to decide it on an all or nothing situation, but I do believe that it applies to all six claims. And the five, because they're pricing claims, they all implicate the issue of what the price should have been of energy during a winter storm. The six, the takings one, because it involves what happens when the entity has a problem. So, I'll discuss the takings claim three issues. The first one is, the claim is brought under the Fifth Amendment and Section 1983. If ERCOT is a sovereign of the state, that claim was not properly brought under the Fifth Amendment and Section 1983. Judge Higginbotham's concurrence in the Devalier en banc denial explains that under even NIC, the claim should be brought against only a municipality or a local government, not against the state itself. Number two, this claim absolutely sounds in contract. The allegation at Record 298, paragraph 49. That Devalier site to Judge Higginbotham's concurring opinion in the denial of the en banc isn't a controlling, and it isn't the issue the Supreme Court took cert on. Correct. My point being that NIC... Not controlling, just the most persuasive. Well, it cites NIC, which is Supreme Court binding precedent. But you're saying a utility regulator and what it did during this winter storm wasn't state action for purposes of takings? That the claim as brought against the state is procedurally improper. The claim is brought... By bringing a claim under Section 1983 under the Fifth Amendment, that's the wrong way to bring a claim against a state. That wasn't the ruling below dismissing. The dismissal below is based upon whether it was a sovereign or not. Are you defending that ruling, or you're shifting your argument here? Which is fine. I'm just asking. The CPS decision came out afterward. It confirms our sovereign immunity in state courts. We're to federal courts as well, so I don't believe that that issue is now in dispute. But I will say that under the first factor, the question that the Court looks at under the Preston Hollow case is whether the claim sounds in contract. And at Record 298, paragraph 49, the trustee contends that because it was a material breach of the SFA, ERCOT planned to transition the existing customers. And this Court has found multiple times that when a party is asserting a takings claim that sounds in contract, that's not a proper takings claim. And so that's the issue with the first prong with respect to whether ERCOT was acting as a sovereign or not. Their own pleadings say it's based on a breach of the SFA and a remedy that was exercised. But as I understand this very complex scheme, the transitioning of customers that might lack power doesn't occur pursuant to the contract, right? That's mandated by Texas law. Once those customers may run out of power, it's a state mandate that they be transitioned. Or do you disagree? Or does that not? Well, I'd answer your question, yes or no, because it is a contract. But that contract, the standard form agreement, is section 22 of the protocols. The protocols are this entire state law. So even the contract is a regulated contract that all parties enter into. And going into it, know that there are regulations that affect when actions can be taken against them. And so having entered into this marketplace with the idea that there are remedies that are provided for either under contract, if you look at the SFA, which incorporates the protocols, or call them under state law because they have the effect of state law, it still exists as a regulatory scheme. They've waived the remedy? Is that the argument? Or there is no takings in the first place? Because it sounds like, is it regulation 2543 that governs this sort of last resort program? Is that it? I believe it's under the administrative code. Okay. And what, okay. And so, I'm not saying that they waived it. I'm saying that the proper remedy is a breach of contract claim if they believe that the transition was done improperly. Okay. And not, not a takings claim. I'd also point out that this Court's binding precedent in de Villiers also finds that a federal takings claim against the state is improper. I understand that it's on review by the Supreme Court. That was, that was a cause of action problem, right? Here they're going after you under 1983. Correct. Okay. That, that isn't the case in de Villiers yet. Correct. But I believe that as the Court points out, Your Honor, and Judge Higginbotham, that the claim against the state would not be proper under 1983 and under the Fifth Amendment. So, turning to I mean, that, that assumes that Urquhart is, is, is an arm of the state. It can be a state actor for purpose, for purposes of Section 1983 without being an arm of the state. Correct. We, we believe that the CPS decision addresses that, that it certainly acts as a state actor under state law. With respect to whether it does so under federal law, that's a different issue. But we also believe that with respect to all of these issues, as I said, the abstention argument could apply to all of them. The filed rate doctrine applies to at least five of these six claims. This Court's decisions and the hundred-year-old Supreme Court precedent regarding the filed rate are directly implicated by the allegations of the trustee. In multiple places, they challenge the idea that they have to pay the rate that everybody else had to pay in the market. They're, they're making a more nuanced argument, I think. You will hear when they stand up. But I thought they were relying on that, the appellate decision center point to say that we're, we're happy with the rate. The rate before the storm is fine. We just think what happened next was there were add-ons and severe adjustments that were done without authority. And that Texas law allows that. That doesn't implicate the filed rate doctrine. And, and the problem with that argument, because what they say at Record 294, Paragraph 39 is what Your Honors pointed out, that left this price in place for 33 hours in breach of the protocols, in breach of the orders. Yeah. But the CPS decision says the issue, the decision to maintain the $9,000 price during the filed 33 hours is the very activity that the PUCT regulates and specifically found that the $9,000 price was directed by the PUCT orders. So now the Supreme Court of Texas has in the CPS decision, as part of its decision, found that the PUCT orders did require a $9,000 price. And so if they want to challenge what the Supreme Court has found regarding a price or what the effect of the orders was or how the orders apply, then they are challenging the filed rate. Directed through inaction? Well, they directed through the February 15th and 16th orders and the failure to do anything thereafter. It's both, Your Honor. They, they specifically entered the orders. Is that issue in Luminante? Is that alive at all? What aspect of this litigation would Luminante shed light on? Luminante decides whether, it's Luminante, yes, Your Honor. So Luminante is deciding whether the orders were properly entered pursuant to Pura and the Administrative Procedure Act. And so the fifth, the Supreme Court's decision in that case could also foreclose some of the arguments that the trustee is making in this court. And so all of this, the, the I'd like to see how that would affect this case. Be a little bit more specific. Sure. So if the Supreme Court of Texas finds that the PUCT orders were properly entered and directed or caught to issue, enter the 9,000 pricing to our Winter Storm URI, then that would foreclose most of the arguments being made by the trustee about the orders being vague or not directing this action or that the price should be something different based upon the protocols. All those arguments would go away. And so the very idea that we should wait for the Supreme Court to decide these issues, or the state courts in general should decide these issues, as the Just Energy Court found, explains why abstention's proper, why the filed rate is proper, or the filed rate challenge is not allowed, as well as why the PUCT should be a necessary party here. Well, so this gets back to a conversation we had a few, a few minutes ago. I mean, there's a distinction between our abstaining under Burford and our saying that we put this case on hold or that we stay it awaiting some further development, whether it's judicial or administrative by the state. Is that a fair distinction? I mean, we need to figure out which one we're doing or neither. I think that you would do what the Just Energy Court said and what would happen by effect is that the bankruptcy court, which it did in the Just Energy case, which it did in the Gritty case, is stay the case pending the resolution of state agency and state court action. There was no takings claim in that case. Correct, Your Honor. But the CPS— We have to deal with the supremacy clause here a little bit. Sure. And in the CPS case, there was a negligence claim and a takings claim, and the court found that those fall within the PUCT's exclusive jurisdiction and that they should decide that in the first instance. Burford had a due process claim in the court, and the Supreme Court said the Railroad Commission should decide in the first instance. So you could abstain from the takings claim or stay the takings claim, to use more specific language, stay the takings claim, allow them to try to challenge and determine whether the takings was improper or caused some harm to them, and then after the PUCT makes those decisions, it can be reviewed all the way through the state courts, up to the U.S. Supreme Court if they wanted, and then seek the final adjudication in the bankruptcy court. That's your primary argument? This is your primary argument as to the takings claim? I think it's not properly pleaded, but correct. I think that it sounds in contract and Preston Hollow controls that, but yes, I think abstention is important as well because of Burford and Strada as well as DeVilliers. I'll wrap up because I'll give time to our amicus by saying that all of the issues that we've discussed over the last 20 minutes relate to a regulatory scheme and the actions not just of ERCOT, but the actions of PUCT, and whether they directed or what the price should have been or whether the regulatory scheme means that there's a claim allowed for takings, all of them require the necessity of the PUCT as a party, and so if the PUCT is added as a party and because it is sovereign under the explained the effect of CPS. I understand this Court will apply the Clark factors, but the same factors were discussed at length by the Supreme Court of Texas. It determined that the source of funding, the autonomy, the statewide problems that ERCOT deals with, and for the reasons that this Court has found in Daniel and Canada Hockey, that the public university institutions of the state of Texas, and not just the universities themselves, but also the health arms, the athletic arms, should be given immunity for that same reason ERCOT should be given immunity. The Court has no further questions. I'll give the rest of the time to our amicus. All right. Thank you, Mr. Hildebrand. Thank you, Your Honor. You've saved time for rebuttal. Yes, Your Honor. So Mr. Street had reserved five, so we'll add the remaining five onto his time, so he'll have ten. Mr. Street. May it please the Court. I represent Calpine, a market participant who relies on the PUC and ERCOT's exclusive regulatory authority under the filed rate doctrine to set market-wide electricity rates. The trustee's attempt to collaterally attack the filed rate in bankruptcy court would undermine that exclusive regulatory authority, and it would discriminate against all other market participants who relied on the filed rate. So what action should we take, in your view? We agree with ERCOT that the proper action is abstention with a stay by the bankruptcy court pending the resolution of administrative and state court proceedings like the Luminant decision, which will address most, if not all, of these claims. I understand the questions about the takings claim. There's not a live takings claim. We agree that it's proper to abstain as to that. They can go take that claim to the PUC, which has exclusive jurisdiction over all of ERCOT's operations. Returning to the discussion that we had twice during the opening argument, the difference between abstention and a stay, I'm not sure that distinction has been addressed as precisely as it needs to be. If we abstain, that means we're not going to decide it. Go away. We're not the proper body to decide it under Burford. A stay would mean that we basically put this matter on hold, either on appeal or tell the bankruptcy court to do that, but that we or the bankruptcy court might return to decide the case. If my distinction is invalid, tell me it's invalid because it matters how we state whatever relief we might give. I think your distinction is valid. I would just phrase it a little bit differently based on Quackenbush and on this Court's opinion in Webb, which is there are principles of abstention, and then there are remedies that come along with those principles. One remedy for abstention is a total dismissal of the case. We have argued that that's not what should happen here. Even as to the pricing claims? Even as to the pricing claims, it should be an abstention with the stay as a remedy, which is exactly what this Court ordered in Just Energy. The Court said that the proper route to determine pricing claims is to go through ERCOT, the PUC, and then up through the Texas State court system, and that's why the bankruptcy court there stayed pursuant to this Court's order to let those proceedings play out. Then once the state court system and the administrative system in the state tells us whether these were valid prices, then we can come back and plug that in to the bankruptcy proceedings. Assuming that we were to agree with what you just suggested, I don't know whether we will or we won't, would we then just simply send it to the bankruptcy court and tell the bankruptcy court to do what you've recommended, or would we keep the case as a stayed appeal? I think you would do it to the bankruptcy court, just as this Court did in Just Energy. And that's because the bankruptcy court in the first instance would address how the resolution of the issues in the state court proceedings applied to the bankruptcy claims. I wanted to briefly address Judge Higginson's question about the proof of claim and the abstention. I don't have the direct page for it, but the court in that case said the state expressly waived any abstention defense. So it was quite different. It was not a case where the state filed a proof of claim in bankruptcy. And so I think it's a false analogy that the trustee is making here to say that filing a proof of claim, which is essentially the only way we could ever get our money back or get its money back, is somehow tantamount to expressly waiving abstention. We would say not at all, and there's no case that they've cited that's even remotely on point for that. But on the filed rate doctrine, I'd like to touch on that a little bit, because even if Before, and this was very helpful, but before, there is no takings claim pending. Would there even be an opportunity for takings relief in state court? Yes, Your Honor. They would, well, I'm not going to waive any defenses or whatever the case may be to those claims, but I think it's analogous to what happened in CPS Energy from the Texas Supreme Court, where there was a, in that case, a state constitutional takings claim, and the court said that that claim had to go to the PUC under the PUC's exclusive jurisdiction. So what the proper path, there's not a pending claim, but the proper path would be for the trustee to take that claim before the PUC and argue that in some way there was a taking, and, of course, Burford tells us that state courts and state agencies are perfectly capable of addressing even federal constitutional claims with review all the way up to the U.S. Supreme Court of the federal issue. So that, we agree takings should be dismissed on the merits, but the court, I think, can pretermit that issue and abstain on the takings claim along with all the pricing claims. On the filed rate doctrine, briefly, we think they are pleading a very artificial theory. I'm sorry, I guess I have used my time, and I want to make sure I don't cut into Mr. Alibi's time for rebuttal. Oh, no, no, he still gets his rebuttal time. Oh, okay. He left five minutes on the table, so that went to you in addition to the five. Okay, so I have four minutes left. So I think they're pleading a very artificial claim in which ERCOT is operating in a vacuum without PUC's exclusive oversight, and their theory seems to be ERCOT went rogue here. It violated its own protocols. But as Mr. Alibi mentioned, the CPS energy case, which was issued while the briefing before this court was pending, directly forecloses that claim. And in the CPS case, the Supreme Court said at page 625, and I'm quoting, the PUC issued the directive to ERCOT to increase pricing to $9,000 per megawatt hour. That's what their pricing claims are challenging. So the Supreme Court has definitively held that that order came directly from the PUC. So what the trustee is challenging here is a rate literally set by the regulator. This is not just some market participant that went rogue. This is a rate directly set by the PUC. So that would be as if during the old rate-setting days of FERC or the ICC, you just went off and sued FERC or ICC directly in federal court and said your rate's unreasonable or tortious. Now, of course, you had to object to that rate before the agency and then take it up through the prescribed path of judicial review, and that's what the trustee needs to do here. The Centerpoint decision then, is that now no longer good law as a result of CPS, or do you think it's distinguishable? I'm not sure what Centerpoint decision you're referring to. The Texas Appellate Court. Oh, the one we talked about in our amicus brief? That was a case, as I recall, where the filed rate was challenged through the proper process, through the PUC and up through the state appellate court. So, of course, that's exactly what we're arguing should happen here. They should file their claim challenging the PUC's orders, and if they have a valid path to do that, as Just Energy suggests that they do, then they go up through that path. And, of course, we know that the PUC has authority to direct a price to be set, notwithstanding ERCOT's own protocols, because this court said that in Just Energy at page 246. The court said, and I'm quoting, ERCOT determines market clearing prices unless otherwise directed by the PUC, its state regulator. So that's what happened here during the winter storm. The PUC stepped in during an emergency and set the rates at the maximum amount. And in any case, even if you didn't believe all of that, the CPS Energy case also says that ERCOT itself is a regulator. That's why it gets sovereign immunity under state law. That's page 616 of CPS. Quote, ERCOT performs the uniquely governmental function of utilities regulation. So, again, they're trying to directly sue a market regulator for its rates. You could not get more within the core or the heartland of the filed rate doctrine than that. And in any case, even if you thought there was some question of whether ERCOT went beyond a PUC order or missed it. If you're saying there's sovereign immunity, then you'd be saying the state would not be liable for a judgment against ERCOT? Or would be? It would not be, right? That's correct, Your Honor. We agree with ERCOT's position on sovereign immunity. The way to challenge that would be through either the ERCOT ADR process through the PUC up through the state court system, which is what Just Energy says. That's their opportunity to challenge price issues is through the ERCOT invoice process. And I would just briefly address the 33 hours argument. Again, that's a question that's directly subject to PUC's oversight. We know PUC was intensively overseeing these rates during the emergency. And so that falls squarely within the filed rate doctrine, as do questions of market manipulation, which is exactly what was at issue in CPS and the TCE district court case, which this court affirmed. All right. Thank you, Mr. Street. Mr. Lyons-Berg? Thank you, Your Honor. May it please the court, Andrew Lyons-Berg for the trustee of the Entrust Liquidating Trust. Pull that microphone a little bit closer. I'm sorry, Your Honor. Is that better? I believe that's better. Obviously, a lot of meaty issues here. I'm happy to take them in whatever order the court would prefer. Absent any instruction, I'll start with abstention. Obviously, the key issue on abstention is whether this case is controlled by Just Energy or not. And as Judge Higginson was discussing with my colleague, I think the key distinction here is that unlike in Just Energy, ERCOT has voluntarily invoked the jurisdiction of the bankruptcy court in order to make a very large claim on the debtors of state. And the cases say — What should it have done? Well, I don't think it's necessarily a matter of what it should have done. It's that — I think it is. It has to be an element of voluntariness in this document. If the bankruptcy proceeding and you're going to forfeit your claim, why can't you just file your claim and protect your interest without engaging in a waiver of your underlying argument? That question, the voluntariness of the trustee's procedure. Yeah. I think the point is just like every other creditor, there is — I agree there's only one way to recover from a bankruptcy estate. But that comes along with the submission to the authority of that court to determine the value of your claims and to determine any counterclaims. But you file and at least cause a cessation of that activity in the bankruptcy court while you proceed through the ordinary course here. Well, I think I agree that this is not precisely the same as Hodori or the other cases we cite where there was a waiver of abstention. But at least where — In every abstention case, you have an invocation of the court's authority from which the court is abstained. Well, I think there's an invocation of jurisdiction by the plaintiff. But so if a governmental entity is hailed into court non-voluntarily, that's a different question. Voluntarily. Exactly. But I think so that case is — So what was Phillips' choice there, to let the bankruptcy court just go, let the claim go? Yes. And I don't think the distinction is that they should have done something different. It's that as with every other creditor, when you invoke the jurisdiction of the bankruptcy court, the bankruptcy court is going to determine the value of your claims. The ERCOT is asking to be placed above all the rest of Entrust's unsecured creditors by having its preferred forum rather than the bankruptcy court decide these issues. The authority you cite, Lynch, is different, right? There's a relinquishment. The government specifically said we relinquish. Yes. But here they're protecting an interest. They never say we relinquish. In fact, they've throughout argued that the filed rate doctrine is a huge impediment. Yeah. So I do agree that those cases are maybe on one side of the spectrum. On the other side of the spectrum is a plaintiff hailing the government into court non-voluntarily. We're somewhere in the middle. And I think that that distinction at least takes this outside of Just Energy, where — The Just Energy language is very, very sweeping. You would agree? In other words, it is — Which language? Well, the language, it is not looking at what the parties did. It's saying, well, our concern here is comedy. Our concern is this very complex regulatory system, and it looks like you're attacking the $9,000 price. Well, I think comedy is what this doctrine ultimately comes down to. And I think comedy comes out very differently where a state entity, rather than being involuntarily hailed into court, is coming to bankruptcy court for a benefit that is only available in bankruptcy court and is yet asking to be treated differently than all the other creditors. And although this is a different issue, obviously, than sovereign immunity, I think the express waiver of sovereign immunity in 106B is relevant to that because there are two things. If we were to say abstention at least to the pricing claims, why wouldn't that spill over to the takings claim? In other words — So I think there's two separate questions there. One is whether the — So the pricing claims are what I've understood them to say should be determined through the state process. Now I think they're saying something a little differently, which is that we should go and take our takings claims also through that state process. The takings claim and the negligence claim, the non-pricing claims, are quite different. But you argued throughout your situation would be an offset, that the two are actually quite connected, that if you were to prevail in the takings, you'd be offsetting against their claim, proof of claim. They're connected. When you read Just Energy, the concern of Just Energy, I'm sure you remember, is the domino effect, that all of these portions to the regulation scheme are interrelated. And so if there were to be a whopping $300 million takings claim against ERCOT, that would implicate the whole system. Well, I should say I think that the takings claim — you know, I don't want to waive the value of it, but I don't think it's a $300 million claim. But in Just Energy, they point out any portion ordered against ERCOT implicates people that are in the system. But I think that the inverse situation that we're in here is critically important to the disruption as well. So in Just Energy, the situation was Just Energy had paid out. They were seeking to claw back that money from ERCOT. So if they recovered on that, they would be extracting money from ERCOT, which would have to in turn extract money from the market participants. Here, I think it's common ground that whatever happens in these pricing claims, no market participant is going to be required to pay out more. It's a question of whether they — what recovery, if any, additionally they will get, because they've already been made whole through the debt obligation order. And I think that's a critical distinction, because what this — you know, the fourth Burford factor, which is what we're talking about, is about disruption to the state's unified interest in unified regulation. And the paradigm case for that, I think, is Burford itself or the Sierra Club versus City of San Antonio case. And there what you have is not just a state's interest in regulating state affairs, but an area where one adjudication affects the whole system. So a singular oil reservoir where the siting decisions and how much oil is going to be allowed to be taken out of each well, you know, diminishes the remaining oil in the shared well and also has — you know, the case talks about natural gas pressures that can actually destroy oil. And similar in City of San Antonio where there's one water reservoir. And as this court in the Grace Ranch case described those cases as, you know, a tower of Jenga blocks, that if a federal adjudication removes one block, the whole thing falls down by its nature. I think Just Energy is already a bit of a departure from that in that the disruption that it found was exclusively from, you know, money having to be paid out from market participants. And here, as I've said, that will not happen regardless of the outcome of this case. And I think even though it might be economically equivalent, you know, having to pay out $10,000 versus not receiving $10,000, I think those things are very different in terms of disruption to the system. So, for example, if I'm hit with a, you know, a surprise medical bill for $10,000, that's a lot more disruptive to my life than if my boss calls me into his office and says, you were maybe going to get a $10,000 bonus, but, you know, times are hard this year. So I think the inverse situation here versus Just Energy comes in both in the disruption factor, which is the most important of the Burford factors, and in the overall comedy discussion, because, again, Entrust has showed up in bankruptcy, has asked for $300 million, and is now saying, bankruptcy court, you are not permitted to adjudicate the value of those claims. If the court were to disagree, I think, obviously, we've been discussing the proper remedy. You know, you go back and read Justice Black's opinion in Burford, and one of the things that's striking is the detail with which he goes on and on describing the complexity of an East Texas field with a central pool, and you touch that spot, touch that spot, touch that spot, touch that spot, on and on. And one wonders, as you read that opinion, you're dealing with a set of cases that, you know, were dealt in con law. I'm kind of wearing a con law teacher hat at the moment. What strikes me is about that is how that maps on to what happens here. And on its face, what is going on with a high court taking that much time and that kind of detail is to demonstrate the kind of complexity and the types of things that really aren't subject to meaningful judicial review without striking hard at state choices about how to regulate. And so, to me, Burford, on its face, comes as a properly clothed and ready to ride here in terms of the decision. As I look at this Texas regulatory scheme, it is a lot like the East Texas field. That's what I'm saying to you. You can help me with that. Well, I agree that they're both, you know, complicated regulatory schemes, but I don't think there's the same danger that one federal adjudication, this one, will have sort of spillover effects to not just other market participants, but to the overall sustainability of the scheme. That's always true, and in a single instance. The problem is the ultimate determination. The ultimate determination of the bill, Dice bill, to get changing hourly rates. The reality is that that particular charge and rate was made. If it had not been made, the whole system would have gone down. We start with that premise. You cannot do that, the necessity of doing so. Well, I think I want to be clear that the nature of the adversary complaint is not that the PUCT's orders were unlawful. And they accuse us of arguing that over and over and over. That's not what the complaint says. The theory of our complaint is that the PUCT orders did not authorize what ERCOT did. And I don't think the court in CPS Energy resolved that question. That was not a litigated question in that case. The Texas Supreme Court's language is not dispositive. And ultimately, I think that's a merits question, not a question for the motion to dismiss stage. When you answered Judge Higginbotham that it wouldn't implicate, but I thought that the $9,000 price that you're challenging as unreasonable or excessive, that was a market rate. So if this were to go right, it was charged to everybody across the board. So it was charged to everybody. Our position is that, and we're now going to the filed rate doctrine a bit, is that it is not a market rate because it was arrived at not by following the market procedures that have been submitted to and approved by the regulator, but by a conscious departure from those procedures. That is the center point point. Yes. Which they say has been answered by CPS. I don't see how it could have been. That was not a litigated question in that case. There's descriptive language in the Texas Supreme Court's opinion, but that was not a question in that case. You would agree if abstention is a threshold question to whether this runs into the filed rate doctrine. I would agree, yes. So if we were to follow, perceive ourselves to be controlled by just energy, do you want to speak to the takings claims and do you have authority that Burford can be some or non-abstention, other claims are abstention? In other words, we sever. Do you have any authority on that? So I have not found specific authority on that. I think that it would not make sense to, and again, I think there's a distinction between, you know, the claim that remains in the bankruptcy court and telling the trustee to pursue that claim through the state procedure. In just energy, we only stayed. Is that correct? So in just energy, the claims, all of the claims were essentially pricing claims, and so this court said that the bankruptcy court should have abstained and sent it down to the bankruptcy court to figure out what that means, basically. And what happened is that the bankruptcy court stayed those proceedings for it to take place in the administrative scheme. They characterized it roughly correctly. It wasn't a dismissal. It was a stay. That's right. And you're saying you're still, are you or aren't you distinguishing between the takings claim and the pricing claim? Yes. Yes, okay. Yes, and so the distinction is the abstention would be for the trustee to take the pricing claims through the administrative procedure. The takings claims are quite different and are not subject to the same integrated scheme, and I think the abstention factors work out quite differently for the takings claim, which is about not the prices that were charged but about what ERCOT did after and trust was unable to pay. Right, but I'm just pressing you with hard questions. The whole last resort program is essential to the entire structure of the scheme. In other words, the takings is premised on the mass transition. The mass transition is what makes the whole scheme work. But I think the critical point about a takings claim is that it does not say that the action was unlawful. It concedes the legality of government action, you know, taking an easement, but it says pay us, exactly. You helped everyone keep their power, but you've got to pay us. Exactly. So there is not the same kind of potential for disruption. You know, I don't agree that there is on the pricing claims, but certainly not for the takings claim. And I want to talk also to the – I'm sorry, Your Honor. No, no. Again, Just Energy does towards the end really get into what they call the domino effect problem, which I would think would be implicated. You and the hearings talked a lot about the offset. It does seem that they're pretty interconnected. Whether or not they've got to pay it on a takings claim or not. But, again, I don't think there's much chance that the takings claim would be more than what they've – you know, the recovery that they've asked for. And to the takings claim, you know, they've made a couple points here. First is about Section 1983 and de Villiers. This is the first time I've heard them to argue that 1983 is not an appropriate cause of action in this case. And, in fact, they argued quite the opposite below, which was that – not that they are the state and so 1983 doesn't apply, but that they are not the state, and so there's not state action. And the existence of a cause of action is not a jurisdictional limitation, so I don't think the court needs to get into that. If it does, a notable thing – so I followed the Supreme Court's de Villiers arguments quite closely, and the Texas Supreme Court – or, excuse me, the Texas Solicitor General in de Villiers represented to the U.S. Supreme Court that that case is really not a problem because there is a state cause of action to enforce the federal takings clause that is assertable in federal court. So if there were a cause of action problem here, it would be a matter of, you know, striking out 1983 and saying state cause of action. So, again, I don't think the court needs to get into that, but that is an alternative that is certainly available based on Texas' representations. And also, you know, whether a private company is the state for 1983 purposes I think is coterminous with the 11th Amendment analysis. So if they do not have 11th Amendment immunity, then they are not the state and they are subject to suit under 1983. The other issue they've raised – That's Joe's rude oral, correct? I'm sorry? He made an oral rule. That's right. But what was the – remind me what the basic premise of his takings clause ruling was there. So it's a little hard to understand. I think that the premise of the ruling was that that theory is – that the state action theory – or that it's incompatible with the arguments for 11th Amendment immunity. And as we've said, you know, incompatibility of legal theories is not a basis for dismissal. But I think that they've conceded that this is state action. After CBS Energy, they're – ERCOT is exercising a delegated state function. So I don't think that issue is live anymore. Instead, they're arguing now that this is actually a contract claim. Those cases are not applicable here. So the cases about the government acting not in its governmental capacity, but in a proprietary capacity, that would be if the government had an unused office building, leased it out to a company, and then had a dispute with that company. That is not at all what's happening here, where ERCOT is regulating. It just happens to be doing it through a contract. So those cases, I think, simply don't apply. And also, as Your Honor was discussing, the Texas Administrative Code mandates the transition procedure. So it also factually is not just contractual. Again, the Bankruptcy Court didn't get here, but there are a lot of arguments lurking in the briefs. I thought it was less that this was a private contract and more that when you sign the market participant agreement, when you sign that agreement, you agree that if you're in default, if you can't provide your customers with power, then the remedy is they get sent somewhere else. And therefore, right? It's the consequence of your default as opposed to state action. And to the extent it's state action, it's not taking anything. It's just finding them a new power source. But none of this has really been sort of ventilated here. None of this has been ventilated because Judge Jones didn't get there. Correct. But what were the flaws to those two points? Because the opposition is making those arguments. Well, I don't think there's – it's not like power providers have other option than to sign that contract if they want to operate. It's a standard form agreement, and it's essentially just the instrument through which ERCOT is regulating the energy market. So I don't think that can be really construed as a waiver of a constitutional claim when it's the only option to participate in this market at all. But again, that issue I don't think is raised in the briefs. They say contract in one sentence, and that's all. I think that that handles the takings claim. I have a couple minutes left. Are there preference for other issues that I should address? In that case, I'll go to the filed-rate doctrine. I think it's helpful to conceptualize this by thinking back to kind of a pre-market-based system and the sort of command-and-control regulation, which is where the filed-rate doctrine originated. And so in that context, a utility would file basically a schedule of rates that would be approved by the regulator. And the filed-rate doctrine, the key point is that it's a two-sided coin, is that customers can't challenge the filed rate based on some external source of law like antitrust. But also, just as much, the utility is not permitted to depart from the rate that was filed and approved with the regulator. Now, in a market-based system, what is filed and approved by the regulator is a set of X anti-market rules that essentially functions as a formula for based on conditions in the world, the price is going to be X. And just as much as the utility, or here ERCOT, can't depart from the rate schedule that says it costs $5 for the ferry across the river, just as much, they can't depart from what the output of that regulator-approved X anti-set of rules would be. And that's the theory of the complaint. And TCE says nothing about that. TCE just says that the output of the market rules is generally subject to the filed-rate doctrine, meaning that, for example, it can't be challenged as anti-competitive or an antitrust violation. But that is certainly not the same as saying that it can't be challenged on the grounds that it was not actually the product of the very thing that was approved by the regulator. And I think an example might be helpful, which is, obviously, the PUCT had set a $9,000-per-megawatt-hour hard cap that was applicable here. If ERCOT had instead, notwithstanding that cap, charged $10,000 or $20,000, I think the outcome of their current argument would be that that would be the filed rate and, similarly, not subject to challenge. And I don't think that can possibly be right, based on the authorities who cited it and also the nature of the filed-rate doctrine as binding the utility here at ERCOT just as much as the payers of the rate. So I want to touch on sovereign immunity. I think the key case here is springboards to education, which the only time the Texas Supreme Court has previously held a private company to be an arm of the state for state sovereign immunity, this court then held in springboards to education that those entities are not entitled to 11th Amendment immunity, precisely because what's widely acknowledged as the most important factor, whether a judgment would be paid out of the state treasury, was not present, and that's exactly the same here. ERCOT is funded by fees that it charges to buyers and sellers of wholesale electricity. That is not the state treasury, and the fact that the CPS court, you know, found under state law that it was an arm of the state is, as springboards to education shows, not dispositive. The dispositive question is the, quote, influence upon the state treasury from a judgment against ERCOT, and I don't think there's any reasonable argument that the Texas state treasury would have to pay out if there was a judgment against ERCOT. Even if they had sovereign immunity, it's been waived by Section 106B. The question there is whether the counterclaims have any logical relationship with the proofs of claims that they've asserted. That is a very low bar, and I want to be clear. So the ERCOT's reply brief has a set of four tests, I guess, for a compulsory counterclaim. Only one of those needs to be satisfied. That is not a list of elements that each need to be satisfied. One is sufficient. And so all that needs to be true here is that there is any logical relationship between the negligence claim and the takings claim and ERCOT's proofs of claim, and that is easily satisfied. So for negligence, the theory of the negligence case is ERCOT, through a continuing course of conduct, was negligent in managing the grid, failing to require winterization. Foreseeably, that was going to cause harm when a foreseeable winter storm comes to Texas. The harm from that claim is precisely the invoices, the extremely high, 300 times the normal rate invoices that ERCOT is trying to collect. Those are the proofs of claim. So that is, I think, a quite clear logical relationship, and the same is true with the takings claim, that the invoices that ERCOT is trying to collect are the very thing that drove interest into bankruptcy and the alleged inability to pay those invoices is the very thing that gave ERCOT the authority under the Texas regulations to take away interest customers. So we don't think there is sovereign immunity under the 11th Amendment. I think, again, Springboard's education makes that clear, but even if there were, it would be waived. I can answer questions about a necessary party or other issues, but I think our briefs are pretty clear on that. All right, thank you, Mr. LeBlanc. Thank you, Your Honor. Mr. Alibi for rebuttal. Let me start with immunity, where my colleague just ended. With respect to immunity, they cite the Springboard's case. The Springboard's case involved a charter school operator and a McAllen ISD. It is not the same as the entity that runs the state grid and keeps electricity running and has been found by CPS to cover statewide issues, utility issues. It's a very different situation. It's no different than the vote decision, which also found that a levy district, these localized interests that don't receive state funding are the types of entities that don't deserve federal sovereign immunity. But as stated, one of the key elements of the test is whether the state would be required to, or the state treasury would be required to pay a judgment against ERCOT, and it would not. The CPS court said, quote, any damages payments would nevertheless come from the state and the public, unquote. The ERCOT funding, as explained in the CPS case, pursuant to Utility Code 39.151, is a state coercive fee that is set forth, and the fee has to be approved by the PUCT, and that amount of money is all that ERCOT has. And so either the fee would have to be increased or money would have to come from the market participants, which would come from the public as well. And so for the reasons that the CPS decision found that the damages payment would come from the state and the public, we believe that this court should find that as well. The court also explained, the CPS court, that the state asserts a direct interest in, freely uses, and directly manages ERCOT's property. And so the assets of ERCOT are state assets, which would be used to pay a judgment. So for those reasons, we believe that the sorts of the funding element is met with respect to the fee, the assets, and a vast difference from the McAllen Independent School District to compare ERCOT to springboards. We, as I said, Daniel, which says that instrumentalities of the University of Texas, such as the health system or the Canada hockey, which deals with the A&M athletic department, those smaller units even receive federal immunity. With respect to waiver and the 106B argument, Supreme Beef is very clear on this. The court's en banc decision said, quote, it covered entirely different periods of time. This negligence claim says that over a 10-year period, ERCOT did not do what it needed to do. And my friend just talked about winterizing prior to the storm. All the issues they raise have nothing to do with a breach of contract claim that seeks damages for a limited period of time during a winter storm. Instead, it's a tort claim seeking punitive damages. The very fact that it covers entirely different periods of time was sufficient in Supreme Beef to find that it was not a related claim. And at Record 307, they talk about this winterization that they just referred to, and because it goes well beyond the scope of the proof of claim, there's no waiver. And I'll point out that in CPS, that claim was made and was dismissed by the state court with respect to that similar type of claim. Judge Higginson, you had asked me about Judge Jones's view. At Record 547, which is in the excerpts at tab 2, he discusses that I knew how he felt about abstention, and the PUC is a necessary party and said that it was preserved. Lynch, at 806, to answer your question, consented to a stipulated judgment, and that's why it was found to be expressly waived. In Hadori, the other case cited, the state of Ohio refused abstention, fought against it. It was the amicus. The right side is you did preserve the argument, then now you've moved to Lynch, and you're saying the distinction there is there was an explicit relinquishment? It consented to a stipulated judgment, which would say I authorize this court to act on its judgment and its powers to enforce it. And in Hadori, this case they cited, when we distinguished, and there's Second Circuit cases that we explained, explaining that there the state of Ohio was protesting against abstention. It was an intervener or an amicus that was asking for it. At the end of the day, what we've heard is that NTRUST wants different treatment. Whether you look at it under the issue of abstention, that these are complicated regulatory issues, just as there were in Burford, or you look at it under just energy and CPS, talking about the scheme of state law and an important interest of Texas, the only state in the country to have its own grid. All of these issues raise market-wide issues that should not be moved for one party or another. The filed rate has the same concept of non-justiciability, that an agency should make these decisions, and non-discrimination, that NTRUST shouldn't get a different result,  that anyone else should get. And for those reasons, the court should either abstain or dismiss the complaint. All right, thank you, Mr. Alibi. Your case is under submission, and the court will take a brief recess before hearing the final three cases.